1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

12

13

14

15

16

17

JACQUELINE ZHANG,

        Plaintiff,

   v.

COUNTY OF MONTEREY, et al.,

        Defendants.

Case No. 17-CV-00007-LHK

**ORDER GRANTING THE COUNTY'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 51

18       Plaintiff Jacqueline Zhang ("Plaintiff") sues Defendant County of Monterey[1] (the

19  "County") for causes of action arising out of the County's termination of Plaintiff's employment

20  with the County. Before the Court is the County's motion for summary judgment. ECF No. 51

21  ("Mot."). Having considered the parties' briefing, the relevant law, and the record in this case, the

22  Court GRANTS the County's motion for summary judgment as to all but one of Plaintiff's causes

23

24  [1] Plaintiff also named the "Monterey County Parks Department" and the "Monterey County
Resource Management Agency" as defendants in her complaint. *See* ECF No. 1 ¶¶ 2–3.
25  However, the County stated in its answer to Plaintiff's complaint that Plaintiff had sued the
County "erroneously as 'Monterey County Resource Management Agency' and 'Monterey
26  County Parks Department.'" *See* ECF No. 20 at 1. The Court will refer to all named defendants
collectively as the "County" because it is undisputed that both the "Monterey County Parks
27  Department" and the "Monterey County Resource Management Agency" are subdivisions of the
County. *See* ECF No. 1 ¶¶ 2–3.

28

1

of action, and DISMISSES Plaintiff's remaining cause of action without prejudice.

## I.     BACKGROUND

### A. Factual Background

Plaintiff is an Asian woman "whose national origin is Chinese." ECF No. 1 ("Compl.") ¶ 7. Plaintiff "is a native of China" and immigrated to the United States from China in 1996. *Id.*; ECF No. 52-1, ¶ 2. English is Plaintiff's second language, and thus Plaintiff speaks English with an accent. ECF No. 52-1 ¶ 2. However, Plaintiff states that her "understanding of English is excellent." *Id.*

Plaintiff has been a licensed California Certified Public Accountant since 2011. *Id.* ¶ 3. Before working for the County, Plaintiff had at least ten years of experience in accounting and finance. *Id.* ¶ 4. However, Plaintiff had never worked a government accounting job before working for the County. ECF No. 52, Exh. 21 at 25 (deposition testimony of Plaintiff confirming that "[t]he first government accounting job that [Plaintiff] worked was with the County"). On September 9, 2015, Plaintiff signed a letter confirming that the County's Parks Department had made a "conditional offer" of employment to Plaintiff and that Plaintiff had accepted the conditional offer. ECF No. 52, Exh. 1. Specifically, the letter confirmed that Plaintiff had been extended a conditional offer to work in "the Finance Manager I position in the Parks Department with a tentative start date of Monday, October 5, 2015." *Id.* The letter also indicated that the person to whom Plaintiff would "report" would be "Mark Mariscal, Director of Parks," and that Plaintiff's "hours of work" would "typically" be "Monday through Friday, 8:00 a.m. to 5:00 p.m." *Id.* Finally, the letter stated that Plaintiff would have to serve "a probationary period of twelve (12) months." *Id.* This was in line with the version of the County's Personnel Policies and Practices Resolution ("Personnel Policies") that was in effect at all times relevant to the instant case. Specifically, under the Personnel Policies, employees like Plaintiff were required to serve an initial "probationary period" before being appointed "to a permanent or seasonal position." ECF No. 52, Exh. 17 at D00006. Further, the Personnel Policies provided that (1) "[u]nless a shorter initial probationary period is set forth in the applicable memorandum of understanding, this

Case No. 17-CV-00007-LHK
ORDER GRANTING THE COUNTY'S MOTION FOR SUMMARY JUDGMENT

[probationary] test period shall be a minimum of twelve (12) months"; and (2) during a County employee's "initial probationary period," the employee "serves at the pleasure of the appointing authority" of the County and "shall have no right to appeal from" any "adverse action" taken by the County against the employee. *Id.*

On September 29, 2015, Mark Mariscal sent an email to Plaintiff to "extend an invitation to" Plaintiff to attend a Parks Commission meeting on Thursday, October 1, 2015. ECF No. 52, Exh. 2. In the email, Mr. Mariscal stated that Plaintiff "may want to spend 30–60 minutes just sitting and listening to the meeting" in order to get a "'flavor' of some of the work" that the Parks Department did. *Id.* However, Mr. Mariscal also wrote that "[i]f you cannot make it, do not worry about it." *Id.* Plaintiff accepted Mr. Mariscal's invitation and attended the Parks Commission meeting on October 1, 2015. *See id.*

Next, on the morning of Monday, October 5, 2015, Plaintiff started her first day in the Parks Department office and spent part of the morning in the County's human resources office completing certain "initial preemployment or employment documents." ECF No. 52, Exh. 21 at 53–55. Among those documents was an "Emergency Contact Form" and "a whole set of [other] documents" and "paperwork," some of which required Plaintiff to "provide [her] social security number." *Id.*

Plaintiff worked under the supervision of Mr. Mariscal for approximately the next nine months. During this time, Mr. Mariscal received complaints about the abrupt tone of some of Plaintiff's email communications. ECF No. 52, Exh. 22 at 39 (deposition testimony from Mr. Mariscal stating that "other people" had reached out to Mariscal because "they felt that maybe either the way that [Plaintiff] said something to them might have been—'offensive' is a strong word, and I don't mean that. But they didn't feel, you know, they just felt that they needed to say something to me"). Nonetheless, in a July 15, 2016 performance appraisal of Plaintiff, Mr. Mariscal wrote positive remarks about Plaintiff and gave her an "overall rating" of "above standard." ECF No. 52, Exh. 4. Further, Mr. Mariscal wrote in the July 15, 2016 performance appraisal that Plaintiff "easily passes her probation." *Id.* However, the performance appraisal also

contained a check box to indicate "Retention/Permanent Status," and Mr. Mariscal never checked that box. *Id.*; *see* ECF No. 52, Exh. 22 at 80–83. During his deposition, when asked about his written remark that Plaintiff "easily passes her probation," Mr. Mariscal affirmatively clarified that the remark was an error that stemmed from his incorrect belief at the time that Plaintiff was only required to serve a nine-month initial probationary period instead of a twelve-month initial probationary period, and that he realized his error the next day. *See* ECF No. 52, Exh. 22 at 80–83 ("Let me state I was wrong.").

In July 2016, as part of a reorganization process within the County, the County's Resource Management Agency ("RMA") began overseeing the Parks Department. *See* ECF No. 53 ¶ 5; ECF No. 60-2 ¶ 20. At this same time, Mr. Mariscal resigned from his position with the County and Shawn Ellerbee, the Deputy Director of Administrative Services for the RMA, became Plaintiff's new supervisor. *See* ECF No. 53 ¶ 3; ECF No. 60-2 ¶ 23. While Mr. Mariscal's work experience had largely been in parks and recreation and management, ECF No. 52, Exh. 22 at 19–20, Ms. Ellerbee had over 30 years of experience in accounting. ECF No. 53 ¶ 2. During her time as Plaintiff's supervisor, Ms. Ellerbee noticed several accounting mistakes by Plaintiff that appeared to stem from a lack of familiarity with governmental accounting rules. *See* ECF No. 53 ¶ 5. For example, Ms. Ellerbee states that on one occasion, Plaintiff tried to classify a transfer of funds as deferred revenue when, according to Ms. Ellerbee, such a classification was not possible under governmental accounting rules. *Id.* On another occasion, Ms. Ellerbee states that Plaintiff submitted financial statements that overstated expenditures because she used the "accrual" method of accounting instead of the "modified" method used in governmental accounting. *Id.* On another occasion, Plaintiff did not understand that funds owed to the County, but not received within sixty days of year-end, cannot be shown on financial statements as revenue. *Id.*

Additionally, shortly after Ms. Ellerbee began supervising Plaintiff, Ms. Ellerbee "noticed that [P]laintiff's emails to vendors and co-workers were sometimes disrespectful in tone" and thus met with Plaintiff to tell Plaintiff that Plaintiff's "emails were coming across as discourteous and that they needed to be softened in tone." ECF No. 53 ¶ 6. Then, on August 11, 2016, one of the

4

vendors, California Parks Company ("CalParks")—which provided services to the Parks Department in operating recreational areas in the southern parts of the County, ECF No. 53 ¶ 7— reached out to Ms. Ellerbee to complain about Plaintiff's email communications. Specifically, Dina Del Dotto, the Finance Director of CalParks, requested a meeting with Ms. Ellerbee "to discuss [Ms. Del Dotto's] concerns with [P]laintiff's interactions with CalParks' staff." ECF No. 53 ¶ 7. Subsequently, Ms. Del Dotto and CalParks General Manager Mark Sandoval met with Ms. Ellerbee and told Ellerbee that "they thought [P]laintiff's verbal and email communications with CalParks' staff were unfair and unprofessional." *Id.*; *accord* ECF No. 55 ¶ 4. They also stated that "they did not feel comfortable having [P]laintiff communicate with" some "new financial staff" members, and thus "requested that [those new staff members] work with someone other than [P]laintiff." *Id.*

Further, on August 22, 2016, Ms. Ellerbee observed that Plaintiff had sent an email to Parks Operations Manager Richard Riddle and Office Assistant Heather Lasley that, in Ms. Ellerbee's opinion, was "discourteous." ECF No. 53 ¶ 8; ECF No. 52, Exh. 10. Thus, Ms. Ellerbee met with Plaintiff once again to tell Plaintiff to "soften the tone of her emails so that they do not sound disrespectful." ECF No. 53 ¶ 8; ECF No. 52, Exh. 21 at 100 (deposition testimony from Plaintiff stating that "Ms. Ellerbee called me to her office" regarding "the [August 22, 2016] e-mail I sent to Richard Riddle . . . and Heather [Lasley]" and "said [Plaintiff] shouldn't use . . . any phrase to make them feel less respected").

Then, on September 27, 2016, Ms. Lasley emailed Ms. Ellerbee to request an opportunity to speak about Plaintiff's email communications. Specifically, Ms. Lasley stated that she wanted "to get a few things cleared up" because Plaintiff copied Ms. Ellerbee on all email communications and Ms. Lasley "didn't like how [Plaintiff] [was] portraying" Ms. Lasley in those emails. ECF No. 52, Exh. 19. Later that day, Ms. Lasley spoke with Ms. Ellerbee and complained that Plaintiff's emails to Ms. Lasley "were belittling and disrespectful." ECF No. 53 ¶ 9. Shortly thereafter, Ms. Ellerbee met with Plaintiff yet again to tell her about the complaints Ellerbee had received from CalParks and Ms. Lasley regarding Plaintiff's email communications.

5

*See* ECF No. 53 ¶ 10; ECF No. 52, Exh. 21 at 109–10.

On October 4, 2016, "a few minutes to 5:00 pm," Plaintiff was summoned by a human resources employee to meet with Ms. Ellerbee and another human resources employee in the office conference room. ECF No. 60-2 ¶ 48. Then, Ms. Ellerbee passed Plaintiff a negative performance appraisal and asked Plaintiff to read it. *Id.* Plaintiff states that she took "about 15 minutes" to read the negative performance appraisal and was shocked by its "false and misleading" contents. *Id.* The negative performance appraisal summarized several accounting and other mistakes that Plaintiff had made, and recounted many of the problems and complaints regarding Plaintiff's email communications with co-workers and outside vendors detailed above. ECF No. 52, Exh. 15. After Plaintiff finished reading the negative performance appraisal, Ms. Ellerbee asked Plaintiff to sign it. ECF No. 60-2 ¶ 48. Plaintiff signed the appraisal and checked the box that read "I disagree with the evaluation and request a meeting with the Reviewing Officer." *Id.*; ECF No. 52, Exh. 15. Finally, at "5:20 PM or later," after Plaintiff had signed the performance appraisal, Plaintiff asserts that Ms. Ellerbee handed Plaintiff a letter titled "Release from Employment During Probationary Period" and told Plaintiff that Ms. Ellerbee was "now releasing [Plaintiff] from probation." ECF No. 60-2, ¶ 48. That letter informed Plaintiff that Plaintiff was being released from her "position of Finance Manager I, and from County service, effective October 4, 2016 at 5:00 p.m. because of [Plaintiff's] failure to satisfactorily complete [her] probationary period." ECF No. 52, Exh. 18. It also informed Plaintiff that (1) Plaintiff's termination was "not subject to appeal"; and (2) if Plaintiff wanted to respond to her termination, Plaintiff could do so by either sending a written response to John Guertin, the "Interim Deputy Director of Land Use and Community Development," or meeting with Mr. Guertin in person "no later than Tuesday, October 11, 2016." *Id.*

After her October 4, 2016 termination, Plaintiff wrote two letters to Mr. Guertin challenging the grounds for her termination, one dated October 10, 2016, and the other dated October 14, 2016. ECF No. 60-2, Exhs. F & G. Plaintiff also met in person with Mr. Guertin on October 24, 2016. ECF No. 60-2 ¶ 51. On November 28, 2016, Mr. Guertin sent a letter Plaintiff

6

1   stating that (1) Mr. Guertin had completed his review of Ms. Ellerbee's October 4, 2016

2   performance appraisal of Plaintiff and Plaintiff's objections to that performance appraisal; and (2)

3   based on his review, Mr. Guertin was "in agreement with the rating provided in the" October 4,

4   2016 performance appraisal and had "signed off" on that performance appraisal "as the Reviewing

5   Officer." ECF No. 60-2, Exh. H.

6       Plaintiff also filed a complaint of discrimination with the County's Equal Opportunity

7   Office on October 27, 2016. In that complaint, Plaintiff stated that she "had started working for

8   the County of Monterey, Parks Department as a Finance Manager I officially on Monday, October

9   5, 2015 reporting to Mark Mariscal, Parks Director." ECF No. 52, Exh. 16 at 96. Plaintiff also

10  alleged that she was terminated from her employment "due to [her] recent marriage to a Chief

11  Deputy Auditor-Controller and [her] ancestry." *Id.* Plaintiff is married to Gary Giboney, who is

12  the County's Chief Deputy Auditor-Controller. *See* ECF No. 52, Exh. 21 at 17; Compl. ¶ 10. In

13  response to Plaintiff's discrimination complaint, the County hired a law firm to investigate

14  Plaintiff's claims. ECF No. 54 ¶ 4. The investigator found no evidence of race, national origin, or

15  marital status discrimination. *Id.*

16  **B. Procedural History**

17      Plaintiff filed the instant action against the County on January 3, 2017. *See* Compl.

18  Plaintiff's complaint asserted the following eight causes of action against the County: (1)

19  discrimination on the basis of race and national original in violation of Title VII, 42 U.S.C. §

20  2000e *et seq.*; (2) discrimination on the basis of marital status, race, and national origin in

21  violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §

22  12900 *et seq.*; (3) discrimination on the basis of race in violation of 42 U.S.C. § 1981; (4)

23  deprivation of a property interest without due process of law in violation of the Fourteenth

24  Amendment of the United States Constitution (pursuant to 42 U.S.C. § 1983); (5) deprivation of a

25  liberty interest without due process of law in violation of the Fourteenth Amendment of the United

26  States Constitution (pursuant to 42 U.S.C. § 1983); (6) deprivation of a property interest without

27  due process of law and employment discrimination on the basis of race and national origin in

28

7

violation of the California Constitution; (7) writ of mandate under California Code of Civil Procedure §§ 1085–86; and (8) writ of mandate under California Code of Civil Procedure § 1094.5. *See id.*

On February 15, 2018, the County filed the instant motion for summary judgment. *See* Mot. Plaintiff filed an opposition on March 5, 2018, *see* ECF No. 60 ("Opp."), and the County filed a reply on March 15, 2018. *See* ECF No. 62 ("Reply").

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## III.    DISCUSSION

As discussed above, Plaintiff's complaint asserts eight causes of action against the County:

(1) discrimination on the basis of race and national original in violation of Title VII; (2) discrimination on the basis of marital status, race, and national origin in violation of the FEHA; (3) discrimination on the basis of race in violation of 42 U.S.C. § 1981; (4) deprivation of a property interest without due process of law in violation of the Fourteenth Amendment of the United States Constitution (pursuant to 42 U.S.C. § 1983); (5) deprivation of a liberty interest without due process of law in violation of the Fourteenth Amendment of the United States Constitution (pursuant to 42 U.S.C. § 1983); (6) deprivation of a property interest without due process of law and employment discrimination on the basis of race and national origin in violation of the California Constitution; (7) writ of mandate under California Code of Civil Procedure §§ 1085–86; and (8) writ of mandate under California Code of Civil Procedure § 1094.5. *See* Compl.

The County moves for summary judgment as to all of Plaintiff's causes of action. *See* Mot. The Court first addresses together all of Plaintiff's race and national origin discrimination causes of action, which are asserted under Title VII, the FEHA, 42 U.S.C. § 1981, and the California Constitution. Second, the Court addresses Plaintiff's cause of action for discrimination on the basis of marital status under the FEHA. Third, the Court addresses Plaintiff's causes of action for deprivation of a property interest without due process of law, which are asserted under the United States Constitution and the California Constitution. Fourth, the Court addresses Plaintiff's cause of action for deprivation of a liberty interest without due process of law under the United States Constitution. Fifth, the Court addresses Plaintiff's claim for a writ of mandate under California Code of Civil Procedure § 1094.5. Sixth, and finally, the Court addresses Plaintiff's claim for a writ of mandate under California Code of Civil Procedure § 1085.

**A. Race and National Origin Discrimination**

The Court first addresses Plaintiff's causes of action for race and national origin discrimination. Plaintiff alleges that she was terminated from her employment with the County because of her race and national origin. Plaintiff asserts her race and national origin causes of action under Title VII, the FEHA, 42 U.S.C. § 1981, and the California Constitution. Title VII provides that it is "an unlawful employment practice for an employer . . . to discharge any

9

individual . . . because of such individual's race, color, religion, sex, or national origin . . . ." 42

U.S.C. § 2000e-2(a).  Similarly, the FEHA provides that it is an unlawful employment practice for

an employer to discharge an employee "because of the race [or national origin]" of that employee.

Cal. Gov't Code § 12940(a).  Along the same lines, 42 U.S.C. § 1981 states that "[a]ll persons

within the jurisdiction of the United States shall have the same right . . . to make and enforce

contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white citizens," and specifies

that "[t]he rights protected by this section are protected against impairment by nongovernmental

discrimination and impairment under color of State law."  42 U.S.C. §§ 1981(a) & (c).  Finally,

Article I, Section 8 of the California Constitution provides that a "person may not be disqualified

from entering or pursuing a business, profession, vocation or employment because of sex, race,

creed, color, or national or ethnic origin."  Cal. Const., art. 1, § 8.

Plaintiff's causes of action for disparate treatment on the basis of her race and national

origin are subject to the three-part burden-shifting analysis described in the United States Supreme

Court's decision in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See id.*

(applying burden-shifting framework to Title VII claim); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th

317, 354 (2000) ("In particular, California has adopted the three-stage burden-shifting test

established by the United States Supreme Court for trying claims of discrimination . . . based on a

theory of disparate treatment."); *Rodriguez v. Gen. Motors. Corp.*, 904 F.2d 531, 533 (9th Cir.

1990) (applying *McDonnell Douglas* burden-shifting framework to an employment discrimination

claim under 42 U.S.C. § 1981); *Dezham v. Macy's West Stores, Inc.*, 2015 WL 46201, at *15

(C.D. Cal. Jan. 2, 2015) (applying *McDonnell Douglas* burden-shifting framework to an alleged

violation of Article I, § 8 of the California Constitution).

Under the *McDonnell Douglas* framework, "an employee challenging an adverse

employment action has the initial burden of establishing a prima facie case of discrimination."

*Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014).  In order to establish a prima

facie case of discrimination, Plaintiff must show that: (1) she is a member of a protected class; (2)

10

she was qualified for her position and was performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside of her protected class were "treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (citing *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)).

If a plaintiff establishes a prima facie case of discrimination, the burden "shifts to the employer to provide a legitimate, nondiscriminatory . . . reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Curley*, 772 F.3d at 632. "This burden is one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the employer has met its burden of providing a legitimate, nondiscriminatory reason for the adverse employment action and the employee has not raised a genuine material fact dispute as to whether the employer's reasons were pretextual, the Court need not address whether the employee has met the employee's burden to establish a prima facie case of discrimination. *Id.*

In the instant case, the Court assumes without deciding that Plaintiff has met her burden of establishing a prima facie case with regards to her race and national origin discrimination claims under Title VII, the FEHA, and 42 U.S.C. § 1981. However, for the reasons discussed below, the Court finds that the County has met its burden of providing a legitimate, nondiscriminatory reason for terminating Plaintiff and that Plaintiff has not raised a genuine dispute of material fact as to whether these reasons were a pretext for race or national origin discrimination.

### 1. The County's Proffered Legitimate, Nondiscriminatory Reason for Terminating Plaintiff

The County's stated nondiscriminatory explanation for terminating Plaintiff is that "Ms. Ellerbee released [P]laintiff from employment because of [P]laintiff's lack of governmental accounting experience, her unprofessional communications, and her unwillingness to follow directions." Mot. at 14. The record supports these rationales. First, as to Plaintiff's governmental accounting experience, it is undisputed that "[t]he first government accounting job that [Plaintiff]

11

worked was with the County." ECF No. 52, Exh. 21 at 25. It is also undisputed that governmental accounting is, at least in some respects, different from private accounting. *See id.* at 25–26 (deposition testimony from Plaintiff stating that government accounting sometimes involves "general funds," which are different from "enterprise funds" in private industry in part because the two types of funds "us[e] different accounting phases"). Further, in her declaration, Ms. Ellerbee identifies three specific instances on which Plaintiff made mistakes that appeared to be attributable to her lack of lack of familiarity with methods and rules that are specific to governmental accounting. *See* ECF No. 53 ¶ 5. Plaintiff's opposition does not contend that these instances never happened, and does not point to any evidence in the record that rebuts Ms. Ellerbee's contention that Plaintiff made accounting mistakes during these instances. *See Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.") (citation omitted); *see also* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion.").

Second, as to Plaintiff's unprofessional communications, it is undisputed that Ms. Ellerbee received complaints from vendors and Plaintiff's co-workers about the tone of Plaintiff's emails, and that Plaintiff's former supervisor, Mr. Mariscal, also received similar complaints. *See* ECF No. 53 ¶¶ 6–9; ECF No. 52, Exh. 22 at 39 (deposition testimony from Mr. Mariscal stating that "other people" had reached out to Mariscal because "they felt that maybe either the way that [Plaintiff] said something to them might have been—'offensive' is a strong word, and I don't mean that. But they didn't feel, you know, they just felt that they needed to say something to me"). Specifically, as discussed above, on August 11, 2016, Dina Del Dotto, the Finance Director of CalParks, requested a meeting with Ms. Ellerbee "to discuss [Ms. Del Dotto's] concerns with [P]laintiff's interactions with CalParks' staff." ECF No. 53 ¶ 7. At that meeting, which was held on September 19, 2016, Ms. Del Dotto and CalParks General Manager Mark Sandoval told Ms. Ellerbee that "they thought [P]laintiff's verbal and email communications with CalParks' staff

12

United States District Court
Northern District of California

were unfair and unprofessional." *Id.*; *accord* ECF No. 55 ¶ 4. Further, they told Ms. Ellerbee that "they did not feel comfortable having [P]laintiff communicate with" some "new financial staff" members, and thus "requested that [those new staff members] work with someone other than [P]laintiff." *Id.* Ms. Ellerbee then reviewed some of Plaintiff's emails to CalParks staff and "found that [P]laintiff's email communications were discourteous." *Id.* For example, in one email dated August 11, 2016, Plaintiff wrote to Ms. Del Dotto, "I understand that you have tons of things to do. But if you ha[d] provided supporting documents for the additional RFA which is over the 1.5% of the revenues from the beginning, I didn't need to waste my time to figure out the difference and requested for explanation and supporting." ECF No. 52, Exh. 13. During her deposition, Plaintiff admitted that she had been frustrated with Ms. Del Dotto "because of the way [Del Dotto] interacted with" Plaintiff, and also acknowledged that "some of that frustration was expressed in some of [Plaintiff's] e-mails to [Del Dotto]." ECF No. 52, Exh. 21 at 125–26; *see also id.* at 121 (deposition testimony from Plaintiff stating, when asked about her working relationship with Ms. Del Dotto, that "obviously, working with not responsive person is not a pleasant experience"); ECF No. 60-2, ¶ 44 ("I had concerns about Ms. Del Dotto being the Director of Accounting for Cal Parks, our management company, because she had very little accounting knowledge. I did my best to explain things fully and to be patient. I was told that it's not easy to find quality professionals down in that part of the County.").

Further, on August 22, 2016, Plaintiff sent an email to Parks Operations Manager Richard Riddle and Office Assistant Heather Lasley that Ms. Ellerbee determined was "discourteous." ECF No. 53 ¶ 8; ECF No. 52, Exh. 10. After reviewing the email, Ms. Ellerbee met with Plaintiff to tell Plaintiff to "soften the tone of her emails so that they do not sound disrespectful." ECF No. 53 ¶ 8; ECF No. 52, Exh. 21 at 100 (deposition testimony from Plaintiff stating that "Ms. Ellerbee called me to her office" regarding "the [August 22, 2016] e-mail I sent to Richard Riddle . . . and Heather [Lasley]" and "said [Plaintiff] shouldn't use . . . any phrase to make them feel less respected"). Then, on September 27, 2016, Ms. Lasley emailed Ms. Ellerbee and requested an opportunity to speak about Plaintiff's email communications. Specifically, in her email, Ms.

Lasley stated: "When you have some free time, can we please have a conversation regarding [Plaintiff]? I would like to get a few things cleared up since she seems to cc you on all correspondence and I don't like how she is portraying me/us in these emails. I don't wish to involve her at this point but may become necessary in the future." ECF No. 52, Exh. 19. Thereafter, Ms. Lasley met with Ms. Ellerbee and complained that Plaintiff's emails to Lasley "were belittling and disrespectful." ECF No. 53 ¶ 9.

Additionally, also as to Plaintiff's unprofessional communications, it is undisputed that Ms. Ellerbee met with Plaintiff at least three times to discuss Plaintiff's email communications and to urge Plaintiff to soften her emails. First, in "early August 2016," shortly after Ms. Ellerbee "began supervising [P]laintiff," Ellerbee "noticed that [P]laintiff's emails to vendors and co-workers were sometimes disrespectful in tone" and thus told Plaintiff that Plaintiff's "emails were coming across as discourteous and that they needed to be softened in tone." ECF No. 53 ¶ 6. Second, as noted above, Ms. Ellerbee met with Plaintiff again after Plaintiff's August 22, 2016 email to Parks Operations Manager Richard Riddle and Office Assistant Heather Lasley in order to tell Plaintiff to "soften the tone of her emails so that they do not sound disrespectful." ECF No. 53 ¶ 8; ECF No. 52, Exh. 21 at 100. Third, on September 27, 2016, Ms. Ellerbee met with Plaintiff yet again to tell Plaintiff about the complaints Ellerbee had received from CalParks and Heather Lasley regarding Plaintiff's unprofessional communications. *See* ECF No. 53 ¶ 10; ECF No. 52, Exh. 21 at 109–10.

Third, as to Plaintiff's "unwillingness to follow directions," Mot. at 14, the County points to Plaintiff's failure to allow Ms. Ellerbee to review certain emails written by Plaintiff before sending those emails to certain recipients. Specifically, Ms. Ellerbee states in her declaration that when she met with Plaintiff to talk about Plaintiff's "discourteous" August 22, 2016 email to Richard Riddle and Heather Lasley, Ellerbee "also told [P]laintiff that [Ellerbee] wanted to run all of [Plaintiff's] emails through [Ellerbee] prior to sending them out to staff or outside vendors." ECF No. 53 ¶ 8. However, it is undisputed that Plaintiff never sent any emails to Ms. Ellerbee for Ellerbee's review. ECF No. 52, Exh. 21 at 103. Thus, during Ms. Ellerbee's September 27, 2016

meeting with Plaintiff, Ellerbee told Plaintiff that Ellerbee had "noticed that some of [Plaintiff's] emails went out to some people without her," ECF No. 52, Exh. 21 at 109–10 (Plaintiff's deposition testimony), and reminded Plaintiff that Plaintiff "should not send out emails without first having them reviewed by" Ellerbee. ECF No. 53 ¶ 10.

Plaintiff does not claim that the County has failed to meet its burden of production to show legitimate, nondiscriminatory reasons for Plaintiff's termination. Accordingly, based on the evidence in the record highlighted by the County, the Court finds that the County has met its burden of articulating legitimate, nondiscriminatory reasons for Plaintiff's termination.

### 2. Plaintiff's Burden to Show Pretext

The County has met its burden of production to show legitimate, nondiscriminatory reasons for Plaintiff's termination. Therefore, under the *McDonnell Douglas* framework, the burden shifts to Plaintiff to adduce evidence that the County's justifications for its decision to terminate Plaintiff amount to mere pretext for discrimination. *See Hawn*, 615 F.3d at 1155. A Plaintiff may demonstrate pretext using either direct or circumstantial evidence. When the evidence of discrimination is direct, a plaintiff needs to present "very little evidence to survive summary judgment in a discrimination case." *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (quoting *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994)). "But when the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat the employer's motion for summary judgment." *Boeing*, 577 F.3d at 1049 (quoting *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005)).

An employee "cannot simply show the employer's decision was wrong, mistaken or unwise" in order to establish pretext. *Dep't of Fair Employment & Housing v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011) (internal quotation marks and citation omitted). Put another way, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1990) ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed

unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."). Thus, in order to show pretext, an employee "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence." *Lucent Techs.*, 642 F.3d at 746. Additionally, the United States Supreme Court has held that in employment discrimination cases, an employer is "entitled to judgment . . . if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination has occurred." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000).

In the instant case, Plaintiff insists that she has both direct and circumstantial evidence of discrimination by the County on the basis of Plaintiff's race or national origin. However, none of the evidence highlighted by Plaintiff amounts to direct evidence of discrimination. The Court first addresses the evidence proffered by Plaintiff that most closely approaches direct evidence of the County's discriminatory intent in terminating Plaintiff's employment. Then, the Court addresses Plaintiff's circumstantial evidence of discrimination.

### a. Direct Evidence of Discrimination

Direct evidence of discrimination is "evidence which, if believed, proves the fact of discriminatory animus *without inference or presumption*." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (alteration adopted) (quoting *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994)). Direct evidence of discriminatory intent typically takes the form of "[r]acist or sexist statements." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 662 (9th Cir. 2002); *see also Cordova v. State Farm Ins. Companies*, 124 F.3d 1145, 1149 (9th Cir. 1997) (employer referred to a Mexican-American employee as a "dumb Mexican"); *Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991) (employer stated that female candidates get "nervous" and "easily upset"). "Particularly because employers now know better, direct evidence of employment discrimination is rare." *Aragon*, 292 F.3d at 662.

The only evidence that Plaintiff points to that even remotely resembles direct evidence of

Case No. 17-CV-00007-LHK
ORDER GRANTING THE COUNTY'S MOTION FOR SUMMARY JUDGMENT

discrimination is evidence that some of Plaintiff's co-workers made "[h]ostile derogatory remarks concerning [Plaintiff's] accent." Opp. at 22. Specifically, Plaintiff relies on the declarations of two of Plaintiff's co-workers, Maureen Lee and Rhonda Stevens. In her declaration, Ms. Lee states that she heard Heather Lasley say, regarding Plaintiff, that Lasley "did not know how [Lasley] could be expected to work with someone who can't even speak English that well." ECF No. 60-6 ¶ 8. Further, Ms. Stevens states in her declaration that "Heather Lasley and her co-worker Kathy said very derogatory things about" Plaintiff like "'can you understand her,'" "'[s]he can hardly speak English,'" or "words to that effect." ECF No. 60-7 ¶ 6.

However, even if these "[h]ostile derogatory remarks concerning [Plaintiff's] accent" were actually made, Opp. at 22, they cannot serve as direct evidence of any discriminatory animus on the part of the County because they were made by Plaintiff's co-workers, and not by a "decisionmaker" like Ms. Ellerbee. *Vasquez*, 349 F.3d at 640 (rejecting an argument that discriminatory remarks made by a co-worker could independently constitute direct evidence of discrimination on the part of the employer). The Ninth Circuit has held that discriminatory remarks that are made outside an employer's employment decision-making process "are insufficient to establish discrimination." *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990). In the instant case, Plaintiff has offered no evidence to suggest that there was any "nexus between" her co-workers' derogatory remarks and the County's decision to terminate Plaintiff's employment with the County. *Vasquez*, 349 F.3d at 640. Although Plaintiff argues that her termination was based in part on Heather Lasley's complaints to Ms. Ellerbee regarding Plaintiff's emails to Lasley, Opp. at 22, Plaintiff does not identify any evidence in the record suggesting that (1) Ms. Lasley complained to Ms. Ellerbee about Plaintiff's English-speaking abilities being subpar; and (2) the County's decision to terminate Plaintiff was based on such a complaint or consideration.

Accordingly, the Court concludes that none of the evidence provided by Plaintiff amounts to direct evidence of discrimination by the County.

### b. Circumstantial Evidence of Discrimination

Because there is no direct evidence of discrimination by the County on the basis of Plaintiff's race or national origin, in order to survive summary judgment, Plaintiff must present "specific and substantial" circumstantial evidence that the County's proffered nondiscriminatory reasons for terminating Plaintiff amount to mere pretext for race or national origin discrimination. *Boeing*, 577 F.3d at 1049. As discussed above, Plaintiff's circumstantial evidence must do more than "show the [County]'s decision was wrong, mistaken or unwise." *Lucent Techs.*, 642 F.3d at 746. Instead, it "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [County]'s proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence," *id.*, and must indicate that "discrimination was the real reason" behind the County's decision to terminate Plaintiff. *Hicks*, 509 U.S. at 515.

None of Plaintiff's circumstantial evidence in support of her race and national origin discrimination claims constitutes "specific and substantial" evidence of pretext. *Boeing*, 577 F.3d at 1049. First, Plaintiff argues that the County's justifications for terminating Plaintiff are pretextual because the "email 'tone' for which [Plaintiff] was terminated was due to cultural and language differences." Opp. at 23. Plaintiff characterizes this as direct evidence of discriminatory animus on the part of the County, *see* Opp. at 23, but as the Court explained above, direct evidence is "evidence which, if believed, proves the fact of discriminatory animus *without inference or presumption*." *Godwin*, 150 F.3d at 1221. Plaintiff's instant argument plainly requires the factfinder to infer racially discriminatory intent from the County's disapproval of Plaintiff's communicative tone in her emails, and thus cannot constitute direct evidence of discrimination on the basis of Plaintiff's race or national origin.

However, even assuming that the tone in Plaintiff's emails was a product of Plaintiff's culture and the fact that English is Plaintiff's second language, Plaintiff points to no evidence that suggests that the County's real motivation for terminating Plaintiff was her cultural background and English-speaking ability, and not the way she communicated with co-workers and vendors. Indeed, as explained above, the record suggests that the County terminated Plaintiff in part out of a

genuine concern about Plaintiff's abrupt tone in her email communications, as demonstrated by the multiple complaints that Ms. Ellerbee and Mr. Mariscal received from co-workers and outside vendors regarding Plaintiff's emails. Further, Plaintiff identifies no evidence suggesting that any of the County's decision-makers themselves associated Plaintiff's abrupt tone with her cultural background and language skills. Without such evidence, Plaintiff's assertion that her communicative tone was a product of "cultural and language differences" does not help her demonstrate that the County's ostensible concern about Plaintiff's tone was actually pretext for a discriminatory animus towards Plaintiff's race or national origin. Opp. at 23.

Relatedly, Plaintiff appears to argue that Ms. Ellerbee's "fail[ure] and refus[al] to explain to others that the wording or perceived 'tone' of [Plaintiff's] emails might be the product of her culture and the fact that English is a second language to her" is evidence of discriminatory intent on the part of the County. Opp. at 8. Plaintiff's argument is not well-taken. The Court does not see how the fact that Ms. Ellerbee *did not* explicitly invoke Plaintiff's race and English-speaking ability to explain Plaintiff's tone suggests racial or national origin bias on the part of Ms. Ellerbee or any County decision-maker. Indeed, had Ms. Ellerbee explicitly and outwardly attributed Plaintiff's tone to Plaintiff's cultural background—as Plaintiff insists Ms. Ellerbee should have done—that explicit attribution could have been used against the County as evidence of discriminatory animus towards Plaintiff on the part of Ms. Ellerbee.

Next, Plaintiff asserts that she "was terminated for reason[s] that would not have led to disciplinary actions of anyone else." Opp. at 7. However, Plaintiff does not identify *any* similarly-situated County employee who (1) exhibited similar job performance and conduct as Plaintiff; and (2) was *not* terminated. Further, the evidence that Plaintiff *does* cite in support of her argument falls well short of comprising specific and substantial proof that Plaintiff "was terminated for reason[s] that would not have led to disciplinary actions of anyone else." *Id.* Plaintiff identifies statements made by her co-workers Maureen Lee and Rhonda Stevens in their declarations. Specifically, Plaintiff points to Ms. Lee's conclusory statement that "[t]he termination of [Plaintiff's] employment was not justified and was very unfair," ECF No. 60-6 ¶

16, and to Ms. Stevens' account of how Ms. Ellerbee "was hostile to [Plaintiff]" from the beginning of Ms. Ellerbee's stint as Plaintiff's supervisor. ECF No. 60-7 ¶ 8. As the County correctly points out, these statements do not "offer anything to suggest" that other County employees would not have been terminated even if they had exhibited similar conduct and job performance as Plaintiff.[2] Reply at 4.

Plaintiff further asserts that Ms. Ellerbee referred to Plaintiff by Plaintiff's initials, "JZ," and "did not refer to other employees by initials." Opp. at 7. However, Plaintiff does not point to, and the Court could not find, any evidence in the record that suggests either (1) that calling Plaintiff by her initials is inherently discriminatory on the basis of Plaintiff's race or national origin; or (2) that Ms. Ellerbee called Plaintiff "JZ" out of some sort of discriminatory animus towards Plaintiff's race or national origin. Further, the fact that Ms. Ellerbee referred to Plaintiff as "JZ" plainly does nothing to demonstrate any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the County's "proffered legitimate reasons" for terminating Plaintiff. *Lucent Techs.*, 642 F.3d at 746.

Plaintiff also argues that Ms. Ellerbee "was planning to terminate [P]laintiff almost from the day" that the RMA began overseeing the Parks Department, "with no real experience with [Plaintiff's] work." Opp. at 5, 22. Specifically, Plaintiff insists that "as early as late August or early September 2016," Ms. Ellerbee told John Guertin, a Deputy Director within the RMA, *see* ECF No. 52, Exh. 18; ECF No. 60-1, Exh. H at 30, "that [Ellerbee] intended to terminate" Plaintiff. Opp. at 5, 22. However, Plaintiff's contention is not supported by the record. The only evidence that Plaintiff identifies in support of her contention is a portion of Mr. Guertin's deposition testimony, but it is clear from that testimony that Ms. Ellerbee never indicated to Mr. Guertin in August or September that she intended to terminate Plaintiff. Instead, Mr. Guertin

---

[2] Plaintiff also states in her opposition that "[n]o one else has ever been terminated for the 'tone' of emails." Opp. at 22. However, Plaintiff does not cite to any evidence in the record to support this contention. Further, even if such evidence existed, it would not help Plaintiff meet her burden of demonstrating pretext unless it also showed that there were other County employees who were similarly-situated to Plaintiff and who exhibited similarly abrupt communicative tones in their emails.

Case No. 17-CV-00007-LHK
ORDER GRANTING THE COUNTY'S MOTION FOR SUMMARY JUDGMENT

testified that he knew in "late August/early September" that there was a "chance" that Plaintiff "might be terminated" because Ms. Ellerbee had expressed to Mr. Guertin her "[c]oncerns about [Plaintiff's knowledge of governmental accounting" and "the way that [Plaintiff] would discuss things with people via e-mail."  ECF No. 63, Exh. 24 at 43–44.

Next, Plaintiff argues that the County's "fail[ure] to follow its own policies and procedures" when terminating Plaintiff is evidence of pretext.  Opp. at 22.  Plaintiff appears to base this argument on three particular alleged deviations from County policies: (1) failing to give Plaintiff advance notice of her termination; (2) failing to give Plaintiff an eleventh month performance appraisal; and (3) allowing Ms. Ellerbee to terminate Plaintiff and Mr. Guertin to serve as the reviewing officer even though neither of them was technically an "appointing authority" for the County.  *See* Opp. at 17–20.  However, even assuming that the County deviated from its policies in these ways when it terminated Plaintiff, Plaintiff points to no evidence indicating that the County adhered to its policies when terminating similarly-situated employees who were not from China or not of Chinese or Asian descent.  Absent such evidence, the County's alleged failure to follow its own policies and procedures when terminating Plaintiff, even if true, is not probative of whether the County's proffered nondiscriminatory reasons for terminating Plaintiff are pretext for race or national origin discrimination.  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007) ("A defendant's failure to follow its own policy is not probative of discriminatory animus in absence of proof that the plaintiff was treated differently than other non-minority employees because Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact.  Turner has introduced no evidence suggesting that RHA adhered to its disciplinary policies differently in cases involving non-minority employees.  Therefore, RHA's alleged failure to follow its policy does not serve to establish pretext." (quotation and citation omitted)).

Plaintiff's identification of Ms. Ellerbee's "fail[ure] to use progressive discipline" before terminating Plaintiff is unavailing for the same reason.  Opp. at 22.  Plaintiff does not point to any evidence in the record that suggests that the County routinely applies progressive discipline to

employees who are similarly-situated to Plaintiff but who are not of Asian or Chinese descent or national origin. Without such evidence, the County's failure to use progressive discipline before terminating Plaintiff does not amount to specific or substantial evidence that the County's reasons for terminating Plaintiff are pretextual. *See Reyes v. HMA, Inc.*, 2008 WL 1883904, at *10 (D. Haw. Apr. 28, 2008) (rejecting the plaintiff's argument that an employer's failure to follow disciplinary procedures set forth in the employer's employee handbook amounted to evidence of pretext for age discrimination because the plaintiff submitted "no evidence suggesting that [the employer] did follow its employee handbook's disciplinary procedures in cases involving younger employees who had had similar disciplinary problems."); *Turner*, 476 F.3d at 346 ("Turner has introduced no evidence suggesting that RHA adhered to its disciplinary policies differently in cases involving non-minority employees. Therefore, RHA's alleged failure to follow its policy does not serve to establish pretext.").

Plaintiff further asserts that Ms. Ellerbee "failed and refused to support [Plaintiff] in her efforts to obtain information and documents from others in the course of her duties." Opp. at 8. However, the only evidence in the record that Plaintiff identifies to support this assertion is a conclusory and general statement from Plaintiff's own declaration that reads: "Ms. Ellerbee failed to provide me with fundamental information I needed about the past history of dealing with certain vendors and situations. She did not give me much needed information." ECF No. 60-2 ¶ 26. This type of "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Nelson v. City of Davis*, 571 F.3d 924, 929 n.2 (9th Cir. 2009) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)). Further, even if Ms. Ellerbee did in fact fail to support Plaintiff "in [Plaintiff's] efforts to obtain information and documents from others," Opp. at 8, that still would not suggest any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the County's proffered justifications for terminating Plaintiff. *Lucent Techs.*, 642 F.3d at 746. Nor would it suggest race- or national-origin-based animus on the County's part in the absence of evidence that Ms. Ellerbee treated similarly-situated non-Chinese or non-Asian employees differently in this

22

regard.

Finally, Plaintiff's claim that Ms. Ellerbee "excluded [Plaintiff] from important meetings and training," Opp. at 8, as well as social events,[3] Opp. at 22, is unavailing for similar reasons. Such an allegation, even if true, does nothing to demonstrate any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the County's proffered nondiscriminatory reasons for terminating Plaintiff. *Lucent Techs.*, 642 F.3d at 746. Further, Plaintiff identifies no evidence in the record suggesting that Ms. Ellerbee's alleged exclusion of Plaintiff from meetings, training sessions, or social events was motivated by racial or national-origin bias, as opposed to one of the many other plausible explanations for Plaintiff's exclusion (such as Plaintiff's communication style). Plaintiff does not offer any evidence indicating, for example, that the employees who were allowed to attend these meetings and training sessions were exclusively or predominantly non-Asian, or that other employees of Chinese or Asian descent or national origin were excluded or had been excluded in the past from these meetings and training sessions.

In short, Plaintiff has provided no "specific and substantial" reason to believe that the County's proffered explanations for Plaintiff's termination are pretextual. Accordingly, the Court concludes that the County has met its burden of production by offering legitimate, nondiscriminatory reasons for Plaintiff's termination and that Plaintiff has failed to meet her burden to demonstrate a triable issue of fact regarding whether these reasons are nothing more than pretext for race- or national-origin-based discrimination. Therefore, the Court GRANTS the County's motion for summary judgment as to Plaintiff's race and national origin discrimination claims under Title VII, the FEHA, 42 U.S.C. § 1981, and the California Constitution.

## B. Marital Status Discrimination

---

[3] The Court notes that Plaintiff's opposition does not point to *any* evidence in the record to support Plaintiff's contention that she was excluded from social events. *See Keenan*, 91 F.3d at 1279 ("It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.") (citation omitted). At her deposition, Plaintiff testified that Ms. Ellerbee frequently went to lunch with another employee and did not invite Plaintiff to those lunches, ECF No. 52, Exh. 21 at 155–57, but that plainly does not support Plaintiff's contention that she was excluded from social events like office lunches or parties.

Case No. 17-CV-00007-LHK
ORDER GRANTING THE COUNTY'S MOTION FOR SUMMARY JUDGMENT

In addition to making it unlawful for an employer to discharge an employee "because of the race [or national origin]" of that employee, the FEHA makes it unlawful for an employer to discharge an employee because of her "marital status." Cal. Gov't Code § 12940(a). Plaintiff's second cause of action asserts a cause of action for discrimination on the basis of Plaintiff's marital status. *See* Compl. at 12–13. The factual allegations in Plaintiff's complaint that appear to be relevant to this cause of action are that (1) Ms. Ellerbee "resented [Plaintiff] due to her marriage to the [County's] Chief Deputy Auditor-Controller," Gary Giboney, and "saw this as a threat"; and (2) Ms. Ellerbee had "a very poor relationship with the Auditor-Controller's Office and was not well respected by that office." Compl. ¶ 10. However, Plaintiff's opposition appears to advance a slightly different theory of marital status discrimination. Specifically, in her opposition, Plaintiff states that she "was married to the Chief Deputy Auditor-Controller," that the Auditor-Controller's "office was engaged in audits of the practices of the RMA," and thus that "[i]t was avoiding the oversight of the [Auditor-Controller's] office and particularly the ongoing investigation that motivated Ellerbee and Guertin" to terminate Plaintiff. Opp. at 23. In other words, Plaintiff's opposition indicates that Plaintiff's marital status discrimination claim is based on Plaintiff's theory that Plaintiff was terminated due to a "concern" that, because Plaintiff was married to the Chief Deputy Auditor-Controller, Plaintiff "would provide information to the [Auditor-Controller's] office." *Id.* at 24.

The County argues that Plaintiff's marital discrimination claim is "insufficient as a matter of law." Mot. at 15–17. The Court agrees with the County. Under California law, an employer engages in marital status discrimination in violation of the FEHA if it takes adverse employment action against an individual because she is unmarried, or because she is married, or because she is married to a member of a protected class. *See Chen v. Cty. of Orange*, 96 Cal. App. 4th 926, 940–43 (2002). However, the FEHA's ban on marital status discrimination does not extend to situations in which an employer takes adverse employment action against an individual because of the "'specific identity or actions of [that] individual's spouse'" as opposed to the spouse's membership in a protected class. *Id.* at 944 (quoting *Donato v. Am. Tel. & Tel.*, 767 So. 2d 1146,

24

1155 (Fla. 2000). Thus, an employer that terminates an employee out of a simple dislike of or "political animus" towards the employee's spouse—as opposed to animus towards any protected class to which the employee's spouse belongs—does not fun afoul of the FEHA's prohibition on marital status discrimination. *Id.* In other words, adverse employment action that is taken against an employee based on that employee's "'status of being married to a *particular* person'" is not actionable as marital status discrimination under the FEHA. *Id.* (quoting *Bammert v. Labor & Indus. Review Comm'n*, 606 N.W.2d 620, 625 (Wis. 1999)).

In the instant case, it is clear that Plaintiff's marital status discrimination claim is based on an assertion that the County terminated Plaintiff because of the "specific identity" of Plaintiff's husband. *Id.* (quotation omitted). As discussed above, Plaintiff's complaint appears to assert the theory that Plaintiff was terminated because (1) Ms. Ellerbee "resented [Plaintiff] due to [Plaintiff's] marriage to the [County's] Chief Deputy Auditor-Controller," Gary Giboney, and "saw this as a threat"; and (2) Ms. Ellerbee had "a very poor relationship with the Auditor-Controller's Office and was not well respected by that office." Compl. ¶ 10. Thus, the theory of marital status discrimination advanced in Plaintiff's complaint amounts to nothing more than an assertion that Plaintiff's termination was motivated by simple "political animus" relating to Plaintiff's husband, and specifically his position as a high-ranking member of an office with which Ms. Ellerbee allegedly had "a very poor relationship." *Chen*, 96 Cal. App. 4th at 944; Compal. ¶ 10.

Further, even assuming it is appropriate to consider the slightly modified theory of marital status discrimination in Plaintiff's opposition, *see Burrell v. City of Santa Clara*, 2013 WL 2156374, at *11 (N.D. Cal. May 17, 2013) (refusing to consider facts raised for the first time at summary judgment), that theory fails as a matter of law for the same reason. As discussed above, in her opposition, Plaintiff asserts that she was terminated because there was a "concern" that Plaintiff "would provide information" to the entity that was conducting an audit of the RMA (the Auditor-Controller's office) due to the fact that she was married to a high-ranking member of that office. Opp. at 24. Thus, the "concern" that allegedly motivated Plaintiff's termination arose

United States District Court
Northern District of California

from Plaintiff's "status of being married to a *particular* person"—namely, the Deputy Chief Auditor-Controller. *Chen*, 96 Cal. App. 4th at 944. Under Plaintiff's theory in her opposition, this "concern" that Plaintiff "would provide information" to the Auditor-Controller's office would not have arisen if Plaintiff had *not* been married or related to—or friends with—anyone in the Auditor-Controller's office. Therefore, it is clear that the theory of marital status discrimination advanced in Plaintiff's opposition also boils down to an assertion that the County terminated Plaintiff because of the "specific identity" of Plaintiff's husband. *Id.* As a result, even if Plaintiff was in fact terminated out of a "concern" that Plaintiff "would provide information" to the Auditor-Controller's office due to her marriage to the Deputy Chief Auditor-Controller, that set of facts would still be legally insufficient to support a cause of action for *marital status discrimination* under the FEHA. *Id.*; *see Nakai v. Friendship House Ass'n of Am. Indians, Inc.*, 15 Cal. App. 5th 32, 40 (2017) ("While laws prohibiting marital status discrimination are to prevent discrimination against classes of people, they do not extend to the status of being married to a *particular* person." (quotations omitted)).[4]

Accordingly, the Court GRANTS the County's motion for summary judgment as to Plaintiff's cause of action for marital status discrimination under the FEHA.

### C. Deprivation of Property Interest Without Due Process of Law

The due process clauses of the United States Constitution and the California Constitution

---

[4] In the section of Plaintiff's opposition that addresses Plaintiff's marital status discrimination claim (which is titled "Plaintiff has stated a valid claim of marital status discrimination under California law"), Plaintiff also appears to argue that the County violated her privacy rights under the California Constitution by terminating her on the basis of her marriage to Mr. Giboney. *See* Opp. at 24 ("Finally, under the California [C]onstitution there is a right of privacy that prevents an employer from terminating an employee based on their romantic association with another person."). However, the County correctly points out that Plaintiff "has never asserted such a claim in this case." Reply at 7. Plaintiff did not plead any alleged violation of her privacy rights in her complaint as a cause of action; indeed, Plaintiff's complaint is devoid of *any* references to privacy. *See generally* Compl. Thus, because "a party cannot oppose summary judgment by raising grounds not at issue in the pleadings," *Gad v. United States*, 2015 WL 12672731, at *4 n.8 (C.D. Cal. July 16, 2015) (citing *Wasco Prods. Inc. v. Southwell Techs. Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)), the Court will not consider Plaintiff's privacy-based arguments.

Further, for the same reason, the Court will not consider Plaintiff's modified theory of marital status discrimination in her opposition to the extent that it can be construed as a whistleblower cause of action.

26

provide that a person may not be deprived of life, liberty, or property without due process of law. *See* U.S. Const. amend XIV, § 1; Cal. Const., art. I, § 7. Plaintiff asserts in her fourth and sixth causes of action that the County violated Plaintiff's procedural due process rights under the United States Constitution and the California Constitution by depriving Plaintiff of her "constitutionally protected property right in her employment" without giving her notice and an opportunity to be heard. Compl. at 14–15, 17.

However, in order to prevail on these procedural due process claims, Plaintiff must establish that she had a constitutionally protected property interest in her employment with the County. *See Dorr v. Butte Cty.*, 795 F.2d 875, 876 (9th Cir. 1986) ("To prevail on the claim that his termination constituted a denial of property without due process of law, Dorr must demonstrate that he had a protected interest in continued employment."); *Ryan v. Cal. Interscholastic Fed.*, 94 Cal. App. 4th 1048, 1059 (2001) ("Preliminarily, we recognize that the strictures of due process apply only to the threatened deprivation of liberty and property interests deserving the protection of the federal and state Constitutions."). "To have a [constitutionally protected] property interest in a benefit, a person clearly must have more than an abstract need or desire" or "a unilateral expectation of it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Instead, a person must "have a legitimate claim of entitlement to it." *Id.* Property interests, however, "are not created by the Constitution." *Id.* Rather, they are created by "'existing rules or understandings that stem from an independent source such as state law,'" *Knudson v. City of Ellensburg*, 832 F.2d 1142, 1144 (9th Cir. 1987) (quoting *Roth*, 408 U.S. at 577), or from written contracts that serve as "clear evidence of a formal understanding supporting a claim of entitlement." *San Bernardino Physicians' Servs. Med. Grp., Inc. v. Cty. of San Bernardino*, 825 F.2d 1404, 1408 (9th Cir. 1987).

Under California law, an employee "serving at the pleasure" of the employer is an "at-will employee who can be fired without cause," *Hill v. City of Long Beach*, 33 Cal. App. 4th 1684, 1693 (1995), and thus a public at-will employee has "no constitutionally protected property interest in continued employment." *Binkley v. City of Long Beach*, 16 Cal. App. 4th 1795, 1808 (1993). Some public employees who are called "probationary" employees are at-will employees.

See *Lubey v. City and Cty. of S.F.*, 98 Cal. App. 3d 340, 345 (1979) ("It is settled law that a probationary (or nontenured) civil service employee, at least ordinarily, may be dismissed without hearing or judicially cognizable good cause."). Thus, dismissal of an at-will probationary employee without cause "does not deprive the employee of a vested, or property, right." *Id.*

In the instant case, the parties do not dispute that Plaintiff was an at-will "probationary" employee of the County for some period of time, during which Plaintiff did not have a constitutionally protected property interest in her employment with the County. However, Plaintiff contends that she *did* have a property interest in her employment with the County when she was terminated on October 4, 2016 because by that time, she "had [already] passed probation" and was thus no longer an at-will or "probationary" employee of the County. Opp. at 11–13.

The Court concludes, however, that Plaintiff has failed to create a dispute of material fact as to whether Plaintiff was an at-will probationary employee of the County when she was terminated. It is undisputed that under the version of the County's Personnel Policies and Practices Resolution ("Personnel Policies") in effect when Plaintiff was employed with the County, County employees like Plaintiff were required to serve an initial "probationary period" before being appointed "to a permanent or seasonal position." ECF No. 52, Exh. 17 at D00006. Further, the Personnel Policies provided that (1) "[u]nless a shorter initial probationary period is set forth in the applicable memorandum of understanding, this [probationary] test period shall be a minimum of twelve (12) months"; and (2) during a County employee's "initial probationary period," the employee "serves at the pleasure of the appointing authority" of the County and "shall have no right to appeal from" any "adverse action" taken by the County against the employee. *Id.* Plaintiff confirmed during her deposition that she understood "probationary period" to mean a period of time during which she could be "discharged at any time, for any reason." ECF No. 52, Exh. 21 at 52–53. It is also undisputed that, in line with the County's Personnel Policies, the County's employment offer letter to Plaintiff informed Plaintiff that she would have to serve "a probationary period of twelve (12) months." ECF No. 52, Exh. 1.

The same employment offer letter also informed Plaintiff that she had a "tentative start

date of Monday, October 5, 2015." *Id.* Further, the relevant facts in the record confirm that October 5, 2015 was the actual start date of Plaintiff's employment with the County. It is undisputed that October 5, 2015 was Plaintiff's first day in the County's Parks Department office, and that on the morning of October 5, 2015, Plaintiff went to the County's human resources department to complete certain "initial preemployment or employment documents." ECF No. 52, Exh. 21 at 53–55. Among those documents was an "Emergency Contact Form" and "a whole set of [other] documents" and "paperwork," some of which required Plaintiff to "provide [her] social security number." *Id.* Additionally, the record indicates that before Plaintiff filed the instant lawsuit, Plaintiff herself viewed October 5, 2015 as her official start date with the County. Specifically, in the discrimination complaint form Plaintiff filled out and filed with the County's Equal Opportunity Office on October 27, 2016, shortly after she was terminated, Plaintiff wrote that she "had started working for the County of Monterey, Parks Department as a Finance Manager I officially on Monday, October 5, 2015." ECF No. 52, Exh. 16.

In sum, the record establishes that Plaintiff began her twelve-month "initial probationary period" with the County on October 5, 2015. Therefore, Plaintiff was an at-will employee of the County from October 5, 2015 to October 4, 2016. It is undisputed that the County discharged Plaintiff on October 4, 2016. As a result, Plaintiff was an at-will probationary employee of the County, and thus did not have a constitutionally protected property interest in her employment with the County, at the time she was terminated.

In her opposition, Plaintiff insists that there is a dispute of material fact as to whether she was still an at-will probationary employee when she was terminated on October 4, 2016. Opp. at 11–13. Plaintiff raises a handful of arguments to support her contention, none of which is persuasive. First, Plaintiff asserts that she "began [her] employment [with the County] prior to October 5, 2015" because (1) "she attended a meeting" on October 1, 2015 "[a]t the request of" Mr. Mariscal, the Director of Parks and her supervisor before the RMA began overseeing the Parks Department; and (2) "she "reviewed Parks budget financial reports of the County" and "went to two of the parks in the system and met with park staff" during "the weekend of October 3

and 4" of 2015.  Opp. at 12.  However, the evidence in the record demonstrates that Plaintiff was not required to do any of these things as part of her employment with the County.  With regards to the October 1, 2015 meeting, although Mr. Mariscal did email Plaintiff to invite her to attend a Parks Commission meeting on October 1, 2015 that was open to the public, *see* ECF No. 53 ¶ 12, Mr. Mariscal made it clear in that email that Plaintiff's attendance was not mandatory.  Specifically, on September 29, 2015, Mr. Mariscal emailed the following to Plaintiff:

> I would like to extend an invitation to you for this Thursday afternoon.  The Parks Commission meets at the Board of Supervisors Chambers (located at the Government Center where your interview took place) on the first floor.  You may want to spend 30-60 minutes just sitting and listening to the meeting.  This may give you a "flavor" of some of the work we do.  If you cannot make it, do not worry about it.

ECF No. 52, Exh. 2.  Further, with regards Plaintiff's review of the "Parks budget financial reports" and her visit to "two of the parks in the system" during the weekend before October 5, 2015, it is undisputed that no one told Plaintiff to do these things, and that Plaintiff did them on her own volition.  ECF No. 52, Exh. 21 at 46–48 (deposition testimony of Plaintiff confirming that nobody told Plaintiff to review the parks budget or visit any parks).  It is also undisputed that Plaintiff did not receive, and never asked for, any compensation from the County for attending the October 1, 2015 meeting or for reviewing the parks budget and visiting parks on October 3 and 4, 2015.  *Id.* at 49.  As a result, the Court finds that the *voluntary* parks-related activities in which Plaintiff engaged before October 5, 2015 do not create a dispute of material fact as to whether Plaintiff's employment with the County started on October 5, 2015.

Second, Plaintiff argues that her employment with the County actually began on Saturday, October 3, 2015.  In support of this argument, Plaintiff offers a declaration from Patsy Girard, the County's "Payroll Manager," in which Ms. Girard explains that (1) "[t]he payroll periods at the County are two weeks in length" and "begin on a Saturday through the following Friday"; and (2) Plaintiff's first pay statement indicates that Plaintiff's first payroll period started on Saturday, October 3, 2015 and ended on Friday, October 16, 2015.  ECF No. 60-5, ¶¶ 4, 6.  Plaintiff also points to Section A.5.6. of the County's Personnel Policies, which provides that "[p]romotions,

demotions, reclassification, transfers, changes in normal hours worked, additional or deletion of pay differentials and changes in status shall be made effective only at the beginning of a pay period unless the County Auditor-Controller, after receiving a statement of necessity from the appointing authority, approved another effective date." Opp. at 12 (citing ECF No. 60-3, Exh. A § A.5.6).

Plaintiff's pay period argument is not well-taken. As an initial matter, Section A.5.6 of the County's Personnel Policies does not appear to support Plaintiff's argument that her initial probationary period started at the beginning of her first pay period because by its terms, the Section A.5.6 applies only to "[p]romotions, demotions, reclassification, transfers, changes in normal hours worked, additional or deletion of pay differentials and changes in status," and not to initial appointments or start dates. *Id.* Further, and more importantly, as discussed above, it is undisputed that (1) Plaintiff did not perform *any* required work for the County until October 5, 2015; (2) October 5, 2015 was the start date listed on the County's employment offer letter to Plaintiff; and (3) Plaintiff completed "a whole set" of initial employment documents and paperwork, including an Emergency Contact Form, with the County's human resources department on the morning of October 5, 2015. Thus, the record demonstrates that October 5, 2015 was Plaintiff's first day of required work with the County, and Plaintiff provides no legal basis to suggest that the beginning of Plaintiff's first pay period, as opposed to Plaintiff's first day of actual work for the County, should be treated as the date on which Plaintiff's initial probationary period began.

Third, Plaintiff argues that Plaintiff "ceased to be a probationary employee on July 15, 2016" because Mr. Mariscal wrote in a July 15, 2016 performance appraisal of Plaintiff that Plaintiff "easily passes her probation." Opp. at 11; ECF No. 52, Exh. 4. However, in his deposition testimony, when asked about this written remark, Mr. Mariscal affirmatively clarified that he erred by indicating that Plaintiff "easily passes her probation" because he incorrectly believed that Plaintiff had a nine-month probationary period as opposed to a twelve-month probationary period. *See* ECF No. 52, Exh. 22 at 80–83 ("Let me state I was wrong."). Mr.

31

Mariscal also testified that he realized his error the next day. *Id.* at 81. More importantly, the July 15, 2016 performance appraisal contained a check box to indicate "Retention/Permanent Status," and it is undisputed that Mr. Mariscal never checked that box. *See* ECF No. 52, Exh. 4; ECF No. 52, Exh. 22 at 80–83. Finally, even if Mr. Mariscal had checked the "Retention/Permanent Status" box on Plaintiff's July 15, 2016 performance appraisal, there is no indication in the record that doing so would have been sufficient to change the length of Plaintiff's initial probationary period from twelve months to nine months. As provided in the County's Personnel Policies, all initial probationary periods "shall be a minimum of twelve (12) months" unless "a shorter initial probationary period is set forth in the applicable memorandum of understanding." ECF No. 52, Exh. 17 at D00006. Plaintiff does not point to any "applicable memorandum of understanding" stating that Plaintiff's initial probationary period was shortened from the default period of twelve months required by the County's Personnel Policies and indicated in the County's employment offer letter to Plaintiff. *See* ECF No. 52, Exh. 1. Thus, as a matter of law, Mr. Mariscal's undisputedly mistaken remark in his July 15, 2016 performance appraisal of Plaintiff was not enough to formally shorten Plaintiff's twelve-month probationary period and elevate Plaintiff from her probationary status on July 15, 2016.[5]

Fourth, and relatedly, Plaintiff asserts that even if Plaintiff was not formally elevated from her probationary status by the July 15, 2016 performance appraisal, Plaintiff "had a reasonable expectation that she had passed probation" based on that performance appraisal and contemporaneous oral representations from Mr. Mariscal that Plaintiff had passed probation. Opp. at 12–13. Thus, Plaintiff argues that as a result of this reasonable expectation, Plaintiff had a property interest in her employment with the County starting July 15, 2016. *Id.* Plaintiff's argument is unavailing. Although a public employee can establish a property interest in her

---

[5] Plaintiff states in her declaration that after she was terminated, she spoke with Mr. Mariscal multiple times and he "repeatedly assured [Plaintiff] that [Plaintiff] had passed probation in July of 2016." ECF No. 60-2 ¶ 17. In addition to contradicting Mr. Mariscal's deposition testimony, Plaintiff's claims about Mr. Mariscal's after-the-fact assurances do not override the County's Personnel Policies and Plaintiff's employment offer letter from the County.

continued employment if she demonstrates that she had "a reasonable expectation of entitlement [to that employment] deriving from existing rules or understandings that stem from an independent source such as state law," *Stiesberg v. California*, 80 F.3d 353, 356–37 (9th Cir. 1996), that expectation of employment must be "based on some state law or independent rule, such as a county or municipal ordinance or civil service rule," *Faurie v. Berkeley Unified Sch. Dist.*, 2008 WL 820682, at *8 (N.D. Cal. Mar. 26, 2008), or "personnel policies in handbooks and manuals," *Pena v. Hous. & Cmty. Serv. Agency of Lane Cty.*, 2010 WL 331789, at *2 (D. Ore. Jan. 28, 2010), or "even from the unwritten common understanding of a particular institution." *Id.* On the other hand, "expectations based on oral representations, employment history, or positive evaluations are not sufficient to give [a public employee] a property interest in his public employment." *Faurie*, 2008 WL 820682, at *9.

In the instant case, as explained above, Plaintiff's expectation that she had been elevated from her probationary status on July 15, 2016 was based exclusively on alleged "oral representations" and a "positive evaluation[]" from Mr. Mariscal, and was therefore "not sufficient to give [Plaintiff] a property interest in [her] public employment." *Id.* Further, in light of the "ordinance[s]" and "personnel policies" relating to the initial probationary periods of County employees, any expectation that Plaintiff might have had about passing her probation on July 15, 2016 was plainly unreasonable. *Faurie*, 2008 WL 820682 at *8; *Pena*, 2010 WL 331789 at *2. Specifically, as discussed above, the County's Personnel Policies state that all initial probationary periods "shall be a minimum of twelve (12) months" unless "a shorter initial probationary period is set forth in the applicable memorandum of understanding," and Plaintiff does not point to any "applicable memorandum of understanding" to support her contention that her initial probationary period was shorter than twelve months. ECF No. 52, Exh. 17 at D00006. Further, the employment offer letter that Plaintiff received from the County indicated that Plaintiff would have to serve a twelve-month initial probationary period. ECF No. 52, Exh. 1.

Fifth, and finally, Plaintiff asserts that even if October 4, 2015 was the last day of her twelve-month probationary period, "she was not terminated until after the workday ended," Opp.

33

at 12 n.14, and thus "she completed" her probationary period "before her termination." *Id.* at 9. In support of this assertion, Plaintiff relies primarily on statements in her own declaration. *Id.* Specifically, Plaintiff highlights her account of the events leading up to her termination, in which Plaintiff states that: (1) Plaintiff was hailed into the conference room to meet with Ms. Ellerbee and an "RMA HR lady" "a few minutes to 5:00 pm" on October 4, 2016; (2) Ms. Ellerbee passed Plaintiff a negative performance appraisal and asked Plaintiff to read it; (3) Plaintiff took "about 15 minutes" to read the negative performance appraisal and was shocked by its "false and misleading" contents; (4) Ms. Ellerbee asked Plaintiff to sign the performance appraisal; (5) Plaintiff signed the appraisal and checked the box that read "I disagree with the evaluation and request a meeting with the Reviewing Officer"; and (6) at "5:20 PM or later," after Plaintiff signed the performance appraisal, Ms. Ellerbee handed Plaintiff a letter titled "Release from Employment During Probationary Period" and told Plaintiff that Ms. Ellerbee was "now releasing [Plaintiff] from probation." ECF No. 60-2, ¶ 48.

In other words, Plaintiff appears to be arguing that Plaintiff completed her last day of probation at *exactly* 5:00 p.m. on October 4, 2016, and that because Ms. Ellerbee did not hand Plaintiff a "notice that [Plaintiff's] employment was being terminated" on October 4, 2016 until "about 5:30 PM, well after the workday was over at 5:00 PM," Plaintiff was no longer a probationary employee at the time of termination. Opp. at 9. The Court disagrees with Plaintiff. Plaintiff offers no legal basis to suggest that the Court must parse this issue as precisely as Plaintiff proposes and treat 5:00 p.m. on October 4, 2016 as the magical property-creating threshold. Even if Plaintiff was not physically handed a notice of termination until 5:30 p.m. on October 4, 2016, it is undisputed that the County terminated Plaintiff *before she left the office* on the last day of her twelve-month probationary period. Additionally, for good measure, it is undisputed that Ms. Ellerbee initiated the process of terminating Plaintiff—specifically, by summoning Plaintiff into a conference room and giving her the negative performance appraisal— *before* 5:00 p.m. on October 4, 2016. *See* ECF No. 60-2, ¶ 48. The Court concludes that these undisputed facts are sufficient to demonstrate that, as a matter of law, Plaintiff was still an at-will

34

probationary employee at the time of her termination.

In sum, the Court finds that Plaintiff has not created a genuine dispute of material fact regarding whether she was an at-will probationary employee of the County when she was terminated. Therefore, Plaintiff has failed to create a triable issue of fact as to whether she had a constitutionally protected property interest in her continued employment with the County. Accordingly, the Court GRANTS the County's motion for summary judgment as to Plaintiff's fourth and sixth causes of action for deprivation of property without due process of law.

### D. Deprivation of Liberty Interest Without Due Process of Law

As discussed above, the due process clause of the United States Constitution provides that a person may not be deprived of life, liberty, or property without due process of law. *See* U.S. Const. amend XIV, § 1. In her fifth cause of action, Plaintiff asserts that the County violated her procedural due process rights under the United States Constitution by depriving Plaintiff of a liberty interest without due process of law. Specifically, Plaintiff argues that (1) the County deprived Plaintiff of "a liberty interest in her personal and professional reputation" by terminating her on October 4, 2016; and (2) the County did so without affording Plaintiff her "due process right to a hearing to defend her reputation." Compl. ¶ 49.

However, an individual who is terminated from public employment is not thereby deprived of any constitutionally protected liberty interests unless the public entity's reasons for or charges relating to the individual's termination (1) implicate the individual's "reputation for honesty or morality," *Matthews v. Harney Cty.*, 819 F.2d 889, 892 (9th Cir. 1987); (2) are "publicly disclosed," *Bollow v. Fed. Reserve Bank of S.F.*, 650 F.2d 1093, 1101 (9th Cir. 1981); and (3) are "sufficiently serious to 'stigmatize' or otherwise burden the individual so that [s]he is not able to take advantage of other employment opportunities," *id.*, and "might seriously damage h[er] standing and associations in h[er] community," *Roth*, 408 U.S. at 473. Thus, "dismissal [of an individual] for reasons of incompetence [or] inability to 'get along' with co-workers," *Bollow*, 650 F.2d at 1101, or "insubordination," "hostility toward authority," or "aggressive behavior," does *not* implicate that individual's liberty interests because none of those reasons "import[s] serious

Case No. 17-CV-00007-LHK
ORDER GRANTING THE COUNTY'S MOTION FOR SUMMARY JUDGMENT

character defects such as dishonesty or immorality." *Gray v. Union Cty. Intermediate Educ. Dist.*, 520 F.2d 803, 806 (9th Cir. 1975).

In the instant case, the Court finds that Plaintiff has failed to create a genuine dispute of material fact regarding whether the County deprived Plaintiff of a constitutionally protected liberty interest when the County terminated Plaintiff. First, Plaintiff does not identify, and the Court could not find, any evidence in the record suggesting that the County made any allegations in connection with Plaintiff's termination that implicated Plaintiff's "reputation for honesty or morality." *Matthews*, 819 F.2d at 892. The only piece of evidence that Plaintiff points to in support of the instant cause of action is the performance appraisal that Ms. Ellerbee completed and had Plaintiff sign on the day of Plaintiff's termination, October 4, 2016. Opp. at 16. However, nothing in that performance appraisal implicates Plaintiff's honesty or morality. Rather, the October 4, 2016 performance appraisal (1) summarizes several accounting and other mistakes that Plaintiff made while working for the County; and (2) recounts Ms. Ellerbee's experiences and observations regarding Plaintiff's email communications with co-workers and outside vendors, as discussed in detail above. ECF No. 52, Exh. 15. Thus, although Ms. Ellerbee's representations about Plaintiff in the October 4, 2016 performance appraisal may touch upon Plaintiff's "incompetence and inability to 'get along' with co-workers," they do not implicate Plaintiff's constitutionally protected liberty interests because they do not "import serious character defects such as dishonesty or immorality." *Gray*, 520 F.2d at 806.

Second, even assuming that at least some of the County's reasons for or allegations related to Plaintiff's termination—as expressed in the October 4, 2016 performance appraisal or elsewhere—implicated Plaintiff's reputation for honesty or morality, Plaintiff has failed to establish that any of those reasons or allegations was or will be "publicly disclosed." *Bollow*, 650 F.2d at 1101; *see also id.* ("Unpublicized accusations do not infringe constitutional liberty interests because, by definition, they cannot harm 'good name, reputation, honor, or integrity.'" (quoting *Bishop v. Wood*, 426 U.S. 341, 348 (1975))). In her opposition, Plaintiff's only argument regarding public disclosure is that (1) Plaintiff's October 4, 2016 performance appraisal was

36

placed in her personnel file; and (2) "[s]uch records are subject to potential disclosure both to prospective employers and also, potentially, to the Public under the California Public Records Act." Opp. at 16.

However, the Court notes that another court in this district has already considered and rejected this exact argument. Specifically, in *Flanagan v. City of Richmond*, 2015 WL 5964881 (N.D. Cal. Oct. 13, 2015), the plaintiff argued that she had submitted enough evidence regarding public disclosure to survive summary judgment on her procedural due process claim "because the stigmatizing information" related to the plaintiff's termination from public employment "was placed in her official personnel file, which is subject to review when she applies for positions at other law agencies." *Id.* at *7. In rejecting the plaintiff's argument, the *Flanagan* court first noted that the California Public Records Act ("CPRA") "does not require disclosure of 'personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy.'" *Id.* at *8 (quoting Cal. Gov't Code § 6254(c)). Instead, the court explained that the CPRA authorizes disclosure of a personnel file *only* if it is determined that the "'public interest in disclosure'" of the personnel file outweighs "'the potential harm to privacy interests'" that would result from such disclosure. *Id.* (quoting *BRV, Inc. v. Superior Court*, 143 Cal. App. 4th 742, 751 (2006)). Then, the court found that it was "likely that [the plaintiff's] privacy interest would outweigh the public interest in disclosure"—and thus "the termination letter in [the plaintiff's] personnel file would not be disclosed as a public record under the CPRA"—because (1) the plaintiff was "not a public official" (and therefore "ha[d] a significantly higher expectation of privacy"); and (2) there was "no evidence that [the plaintiff's] termination and the events leading to her termination [were] a matter of great public concern." *Id.* Accordingly, the court concluded that "the placement of the [plaintiff's] termination letter in [her] personnel file d[id] not constitute public disclosure of stigmatizing information," and therefore granted summary judgment in favor of the defendants as to the plaintiff's procedural due process claim. *Id.* at *8–*9.

The Court finds the reasoning in *Flanagan* persuasive and applies it to conclude in the

Case No. 17-CV-00007-LHK
ORDER GRANTING THE COUNTY'S MOTION FOR SUMMARY JUDGMENT

instant case that Plaintiff has failed to offer sufficient evidence regarding public disclosure to survive summary judgment on her liberty interest due process claim. Like the plaintiff in *Flanagan*, Plaintiff was "not a public official" and offers no evidence to suggest that her "termination and the events leading to her termination" are matters of "great public concern." *Id.* at *8. As a result, Plaintiff's evidence is insufficient to suggest even a modest likelihood that the October 4, 2016 performance appraisal in Plaintiff's personnel file might "be disclosed as a public record under the CPRA." *Id.* Therefore, the Court concludes that Plaintiff's instant cause of action fails as a matter of law because "the placement of the [performance appraisal] in Plaintiff's personnel file does not constitute public disclosure of stigmatizing information." *Id.*

In sum, for the foregoing reasons, the Court finds that Plaintiff has failed to provide sufficient evidence to create a genuine dispute of material fact as to whether the County deprived Plaintiff of her "liberty interest in her personal and professional reputation" when the County terminated her. Compl. ¶ 49. Accordingly, the Court GRANTS the County's motion for summary judgment as to Plaintiff's fifth cause of action for deprivation of a liberty interest without due process of law.

### E. Writ of Mandate Under California Code of Civil Procedure § 1094.5

In her eighth cause of action, Plaintiff asserts that she is entitled to an administrative writ of mandate pursuant to California Code of Civil Procedure § 1094.5 ordering that she be reinstated to her previous position as a Finance Manager I for the County Parks Department with back pay. *See* Compl. at 21–24; Opp. at 16–21. Plaintiff argues that she is entitled to such an administrative writ of mandate "because the employment action terminating her employment were in direct violation of County Ordinances and published Policies." Opp. at 16.

However, under California law, a § 1094.5 administrative writ of mandate seeking review of a public entity's employment decision "is available only if the decision resulted from a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the agency." *DeCuir v. Cty. of L.A.*, 64 Cal. App. 4th 75, 81 (1998). In the instant case, the County's decision to terminate Plaintiff did not

result from a "proceeding in which by law a hearing is required to be given" and "evidence is required to be taken." *Id.* As the Court explained above, Plaintiff has failed to create a genuine dispute of material fact as to whether she was an at-will probationary employee at the time of her termination. Plaintiff points to no statute, ordinance, provision of the County's Personnel Policies, or any other authority that suggests that Plaintiff was entitled to a hearing before being terminated even though she was an at-will probationary employee of the County. Further, as determined above, Plaintiff did not have a due process right to such a hearing under either the United States Constitution or the California Constitution because Plaintiff has failed to establish that she had a constitutionally protected property interest in her continued employment with the County.

As a result, Plaintiff's claim for an administrative writ of mandate pursuant to California Code of Civil Procedure § 1094.5 fails as a matter of law. Accordingly, the Court GRANTS the County's motion for summary judgment as to this claim.

### F. Writ of Mandate Under California Code of Civil Procedure § 1085

Like Plaintiff's eighth cause of action, Plaintiff's seventh cause of action asserts that Plaintiff is entitled to a writ of mandate pursuant to California Code of Civil Procedure § 1085 ordering that she be reinstated to her County position with back pay. *See* Compl. at 18–21; Opp. at 16–21. Plaintiff argues that "even if she [was] a probationary employee" at the time of her termination, she is entitled to a writ of mandate "because the employment action terminating her employment were in direct violation of County Ordinances and published Policies." Opp. at 16–17.

California Code of Civil Procedure § 1085 states that a writ of mandate may be issued "by any court to any inferior tribunal, corporation, board, or person" to either (1) "compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station"; or (2) "compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by that inferior tribunal, corporation, board, or person." Individuals who—like Plaintiff—believe that they were wrongfully terminated from positions of public employment frequently seek to use § 1085 to

39

1  compel reinstatement to their positions and back pay. *See, e.g.*, *Agosto v. Bd. of Trs. of*

2  *Grossmont-Cuyamaca Cmty. Coll. Dist.*, 189 Cal. App. 4th 330 (2010).

3       Although Plaintiff asserts that she is entitled to reinstatement and back pay because the

4  County's termination of her violated "County Ordinances and published Policies," Opp. at 16, the

5  three alleged violations that she identifies in her opposition are all procedural violations of the

6  County's Personnel Policies, which is a County *resolution* (as opposed to an ordinance). *See* ECF

7  No. 52, Exh. 17 at D00001 ("Monterey County Personnel Policies and Practices Resolution No.

8  98-394"). Specifically, Plaintiff asserts that the County violated its Personnel Policies in

9  terminating Plaintiff by: (1) failing to give Plaintiff advance notice of her termination; (2) failing

10 to give Plaintiff an eleventh month performance appraisal; and (3) allowing Ms. Ellerbee to

11 terminate Plaintiff and Mr. Guertin to serve as the reviewing officer even though neither of them

12 was technically an "appointing authority" for the County. *See* Opp. at 17–20. The Court further

13 notes that Plaintiff has produced some evidence to support at least the first alleged procedural

14 violation. That is, Plaintiff has provided some evidence suggesting that the County violated its

15 Personnel Policies by failing to give Plaintiff advance notice of her termination. In particular,

16 Section D.1 of the Personnel Policies provides that any "adverse action," including "dismissal,"

17 against "an employee who serves at the pleasure of the appointing authority . . . *shall* be

18 accomplished by a single written notice which sets forth the adverse action and *provides the*

19 *opportunity for the employee to discuss that action with his/her appointing authority prior to its*

20 *effective date*." ECF No. 52, Exh. 17 at D00016 (emphases added). However, Plaintiff did not

21 receive notice of her termination until October 4, 2016, which also appears to have been the

22 "effective date" of her termination. *See* ECF No. 52, Exh. 18 ("October 4, 2016" letter from Ms.

23 Ellerbee to Plaintiff titled "Release from Employment During Probationary Period" stating that "I

24 am releasing you from your position of Finance Manager I, and from County service, effective

25 October 4, 2016 at 5:00 p.m. because of your failure to satisfactorily complete your probationary

26 period"). Thus, the notice of termination that Plaintiff received does not appear to have provided

27 her an "opportunity . . . to discuss" her termination "prior to its effective date," as required by

28

Section D.1 of the Personnel Policies.  ECF No. 52, Exh. 17 at D00016.

As a result, Plaintiff's seventh cause of action appears to raise the following issue of law: whether a terminated at-will probationary employee of a public entity can be entitled to reinstatement and back pay under California Code of Civil Procedure § 1085 based solely on that public entity's failure to comply with a termination-related procedural requirement set forth in a municipal resolution.  For the reasons stated below, the Court (1) finds that this is a novel and complex issue of state law; and therefore (2) declines to exercise supplemental jurisdiction over the instant cause of action.

A federal court may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Conversely, a court may decline to exercise supplemental jurisdiction over a state law claim if "the claim raises a novel or complex issue of State law."  *Id.* § 1367(c)(1).  However, "[n]ovelty alone does not determine whether a district court should decline supplemental jurisdiction."  *Matera v. Google Inc.*, 2016 WL 8200619, at *17 (N.D. Cal. Aug. 12, 2016).  Instead, in considering whether to retain supplemental jurisdiction, a court should also consider factors such as "economy, convenience, fairness, and comity."  *Acri v. Varian Assocs.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (citations and internal quotation marks omitted).

In the instant case, the parties do not cite, and the Court could not find, any federal or state decisions that have addressed whether a mere procedural violation of a municipal resolution by a public entity in terminating an at-will probationary employee can entitle that employee to reinstatement to her former position and back pay under California Code of Civil Procedure § 1085.  To be sure, there are decisions that have enunciated principles that appear to be relevant to the issue, but those decisions and principles point in conflicting directions.  On one hand, California courts have stated that "[a] writ of mandate [under § 1085] will not issue unless it is necessary to protect a substantial right and upon a showing that some substantial damage will be suffered by the petitioner if the writ is denied."  *Grant v. Bd. of Med. Examiners*, 232 Cal. App. 2d

41

820, 827 (1965). In other words, an "alleged right may be abstract, inchoate, or so lacking in substantiality that the 'extraordinary' remedy of mandamus is not warranted." 8 B. Witkin, *California Procedure* § 75 (5th ed. 2008). As discussed above, Plaintiff has not demonstrated that she had a constitutionally protected property interest in her continued employment with the County. Thus, the only rights that the County could have violated in terminating Plaintiff were procedural in nature—like Plaintiff's right to advance notice of her termination under the Personnel Policies. In light of the principle that only deprivations of "substantial" rights can warrant the "extraordinary" remedy of mandamus under § 1085, it is questionable whether deprivations of mere procedural rights—like the ones alleged by Plaintiff in the instant case—can warrant a writ of mandate under § 1085.

On the other hand, several California decisions have issued writs of mandate ordering reinstatement of and back pay to terminated probationary public employees on the grounds that "[a] civil service probationer is entitled to have the statutory procedure for dismissal strictly followed." *Wiles v. State Personnel Bd.*, 19 Cal. 2d 344, 351 (1942) (citing *Brown v. State Personnel Bd.*, 43 Cal. App. 2d 70 (1941), and *Nilsson v. State Personnel Bd.*, 25 Cal. App. 2d 699 (1938)); *accord Santillano v. State Personnel Bd.*, 117 Cal. App. 3d 620, 623 (1981) (quoting *Wiles*, 19 Cal. 2d at 351); *Birdsall v. Carrillo*, 231 Cal. App. 3d 1426, 1432 (1991) (quoting *Santillano*, 117 Cal. App. 3d at 623); *Cal. Dep't of Corr. & Rehab. v. State Personnel Bd.*, 238 Cal. App. 4th 710, 723 (2015) (quoting *Santillano*, 117 Cal. App. 3d at 623). These cases appear to support Plaintiff's position because they can be read to suggest that even if a public employee is on probationary status (and therefore has no constitutionally protected property interest in her employment), she can still be entitled to reinstatement and back pay if she is terminated in a way that fails to strictly comply with termination-related procedures.

However, these "strict compliance" decisions are not exactly on point because they are different from the instant case in at least two potentially meaningful ways. First, all of the "strict compliance" decisions involved violations of termination-related procedures set forth in state statutes or municipal ordinances, while the instant case involves only a violation of procedures set

42

forth in a municipal resolution, as explained above.  Second, in all of the "strict compliance" decisions, the public entity's failure to strictly comply with termination-related procedures caused the employee to either (1) receive notice of her termination only after she had already completed her probationary period; or (2) receive notice that her termination would take effect on a date after her probationary period was scheduled to end.  *See Wiles*, 19 Cal. 2d at 346–47; *Santillano*, 117 Cal. App. 3d at 622–23; *Birdsall*, 231 Cal. App. 3d at 1428–29 (1991); *Cal. Dep't of Corr. & Rehab.*, 238 Cal. App. 4th at 714–15.  Put another way, in all of the "strict compliance" cases, the result of the procedural violation was that the employee's termination was not effected until *after* the employee had *already* completed her probationary period—and had thereby acquired a constitutionally protected property interest in her continued employment with the public entity.  In the instant case, however, although the County may have violated a procedural requirement set forth in the Personnel Policies by failing to give Plaintiff advance notice of her termination, Plaintiff's termination was nonetheless effected while Plaintiff was still a probationary employee of the County.

As a result, the Court finds that Plaintiff's seventh cause of action raises a novel and complex issue of state law within the meaning of 28 U.S.C. § 1367(c)(1).  Further, the Court finds that the factors of economy, convenience, fairness, and comity weigh in favor of declining supplemental jurisdiction over Plaintiff's seventh cause of action.  Although the parties have litigated this case to summary judgment, the vast majority of the discovery taken by the parties is not relevant to the instant cause of action, and the Court has already resolved all of Plaintiff's other causes of action.  Put another way, Plaintiff's seventh cause of action is primarily a legal issue because it required only a modest amount of factual discovery regarding whether the County violated any termination-related procedural requirements applicable to probationary employees when it terminated Plaintiff.  As a result, the Court finds that any inefficiencies and inconvenience that might result from declining supplemental jurisdiction over Plaintiff's seventh cause of action would be minimal.  Further, the Court finds that considerations of comity weigh heavily in favor of declining supplemental jurisdiction over Plaintiff's seventh cause of action.  Dismissal of

43

Plaintiff's seventh cause of action would enable the California courts to resolve a novel, complex, and seemingly important issue of state law regarding the reach of the writ of mandate remedy in the context of public employment.

Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's seventh cause of action for a writ of mandate under California Code of Civil Procedure § 1085, and instead DISMISSES that cause of action without prejudice. Plaintiff may pursue her seventh cause of action in state court.

## IV. CONCLUSION

For the foregoing reasons, the County's motion for summary judgment is GRANTED as to all of Plaintiff's causes of action except Plaintiff's seventh cause of action. The Court declines to exercise supplemental jurisdiction over Plaintiff's seventh cause of action, and instead DISMISSES that claim without prejudice.

**IT IS SO ORDERED.**

Dated: April 24, 2018

_Lucy H. Koh_

LUCY H. KOH
United States District Judge